**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| POLICE & FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>TRIP.COM GROUP LIMITED, JANE JIE SUN, and CINDY XIAOFAN WANG,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR A JURY TRIAL |

Plaintiff Police & Fire Retirement System of the City of Detroit ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Trip.com Group Limited ("Trip.com" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities that purchased Trip.com American Depositary Shares ("ADSs") between April 30, 2024 and June 24,

2026, inclusive (the "Class Period") against Trip.com and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Trip.com (a/k/a, Ctrip.com International, Ltd.) is a Singapore-based online travel services provider and the largest online travel platform in China, deriving a substantial portion of its revenue from hotel reservation commissions generated through its accommodations business.

3. Prior to the Class Period, in 2021, China's chief antitrust regulator, the State Administration for Market Regulation ("SAMR"), had intensified enforcement efforts against major internet platform companies, imposing significant penalties for exclusionary and anticompetitive practices. To reassure the SAMR of its commitment to fair competition, Trip.com publicly pledged to enhance its compliance controls and refrain from anticompetitive conduct, including imposing restrictions that forced merchants to choose its platform over competitors.

4. Against this backdrop of increased antitrust enforcement, Trip.com also sought to reassure investors that it was complying with applicable competition laws. Indeed, on the first day of the Class Period, Trip.com expressly stated that it did "not have exclusive arrangements with our ecosystem partners." Additionally, throughout the Class Period, Trip.com repeatedly attributed its financial success to strong travel demand and the strength of its online platform, claiming that revenue growth reflected "healthy demand across our key markets and business segments" and touting its "scale, strong local partners, and extensive product coverage" as key drivers of its growth and competitive advantage.

5. However, unbeknownst to investors, Trip.com's growth and profitability were materially supported by the very conduct it had assured investors and regulators it would not engage in, including exclusive arrangements with hotel operators and other coercive measures

designed to suppress competition. These practices generated significant but unsustainable financial benefits and, once exposed, subjected the Company to heightened regulatory scrutiny and substantial penalties.

6. The truth began to emerge on January 14, 2026, when the SAMR announced that it had initiated an investigation into Trip.com for suspected anticompetitive misconduct in violation of China's Anti-Monopoly Law. Bloomberg's reporting on the investigation highlighted regulatory concerns regarding "unfair restrictions" on merchant transactions and pricing. On this news, Trip.com's ADS price fell approximately 17%, closing at $62.78 per ADS that same day.

7. Following the SAMR's announcement, UBS analysts stated that the investigation was likely focused on "de facto exclusive partnerships," under which Trip.com received preferential inventory, pricing, and commission arrangements. J.P. Morgan analysts stated that they believed the scrutiny centered on Trip.com's reported "price adjustment tool," which could reset hotel rates on Trip.com to the lowest price available online. J.P. Morgan further characterized the investigation as "complaint [and] evidence-driven" and "company-specific."

8. The truth was fully revealed on June 24, 2026, when Trip.com reported first-quarter 2026 adjusted earnings per ADS of 5.73 yuan, below analysts' expectations of 6.09 yuan, and disclosed that it expected year-over-year total net revenue growth to decelerate to approximately 3% to 8% in the second quarter of 2026. The Company attributed the slowdown, in part, to "operational adjustments the Company implemented to align with evolving industry standards and compliance frameworks." During the corresponding earnings call, Chief Executive Officer Jane Jie Sun ("CEO Sun") acknowledged that these efforts had "caused some short-term pressure" on Trip.com's operations. On this news, Trip.com's ADS price fell more than 12%, closing at $40.49 per ADS on June 25, 2026.

9. In response to these revelations, Deutsche Bank analysts noted that the Company's second-quarter revenue guidance "significantly undershoots consensus" estimates and attributed the weaker outlook, in part, to "operational adjustments to align with evolving industry standards and compliance frameworks." Similarly, Macquarie Equity Research analysts cited "domestic hotel business adjustments" resulting from "regulatory guidance" and warned that "ongoing regulatory investigations . . . could weigh on monetisation upside and reduce short-to-medium-term earnings visibility."

10. Finally, just one month after the Class Period, on July 25, 2026, the SAMR announced that it had "imposed administrative penalties" on Trip.com, including fines and confiscations totaling 5.179 billion yuan (approximately $765 million as of that date), following a comprehensive investigation into the Company's anticompetitive practices. The SAMR stated that the investigation—involving on-site inspections, extensive evidence collection, and data and algorithm analysis—"found that, since 2020," Trip.com had "abused its dominant position in China's domestic online hotel booking platform services market" through "two types of monopolistic conduct[.]" Specifically, the investigation revealed that Trip.com required certain hotel operators to engage in exclusive arrangements that prohibited cooperation with competing platforms and forced other hotel operators to offer the "lowest price across all platforms." The SAMR further found that Trip.com monitored compliance with these requirements and enforced them through "restricting traffic, removing hotels' designated status ("摘牌"), and deducting order reserve funds." Accordingly, Trip.com's conduct constituted an "an abuse of a dominant market position through imposing restrictions on transactions without legitimate justification and attaching unreasonable trading conditions" in violation of China's Anti-Monopoly Law.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's ADSs when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

16. Defendants have submitted to personal jurisdiction in the State of New York. Included as Exhibit 2.12 in the Company's annual report for the year 2025, Trip.com's deposit agreement—dated as of December 8, 2003, amended and restated as of August 11, 2006, and further amended and restated as of December 3, 2007—states the following:

> The Issuer hereby (i) irrevocably designates and appoints CT Corporation System, 111 Eighth Avenue, 13th Floor, New York,

> New York 10011, in the State of New York, as the Issuer's authorized agent upon which process may be served in any suit or proceeding arising out of or relating to the Shares or Deposited Securities, the American Depositary Shares, the Receipts or this Agreement, (ii) ***consents and submits to the jurisdiction of any state or federal court in the State of New York in which any such suit or proceeding may be instituted,*** and (iii) agrees that service of process upon said authorized agent shall be deemed in every respect effective service of process upon the Issuer in any such suit or proceeding.

17. Defendants have availed themselves of the privileges of doing business in the United States by depositing Trip.com's ordinary shares with a U.S.-based depository bank, issuing Trip.com's ADSs, listing Trip.com's ADSs on the Nasdaq Global Select Market (the "Nasdaq") under the ticker "TCOM," registering them with the SEC on Form F-6, and maintaining the registration and listing of those ADSs. During the Class Period, as of June 2026, Trip.com had more than 600 million ADSs outstanding. Each Trip.com ADS represents one ordinary share. The Company's ADSs may be held either: directly by (1) having an American Depositary Receipt, which is a certificate evidencing a specific number of ADSs registered in the holder's name, or (2) having uncertified ADSs registered in the holder's name; or indirectly by holding a security entitlement in ADSs through a broker or other financial institution that is a direct or indirect participant in The Depository Trust Company (DTC).

**PARTIES**

18. Based in Detroit, Michigan, Plaintiff is a public pension system that provides retirement and other benefits to firefighters and police officers. Plaintiff manages approximately $2.9 billion in assets for the benefit of more than 12,000 active and retired members and beneficiaries. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Trip.com ADSs during the Class Period and suffered damages as a result of the

federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant Trip.com's principal executive offices are located in Singapore. Trip.com's ADSs trade on the Nasdaq under the ticker symbol "TCOM."

20. Defendant Jane Jie Sun served as the Company's Chief Executive Officer ("CEO") at all relevant times.

21. Defendant Cindy Xiaofan Wang ("CFO Wang") served as the Company's Chief Financial Officer ("CFO") at all relevant times.

22. Defendants Sun and Wang (together, the "Individual Defendants"), because of their positions with Trip.com, possessed the power and authority to control the contents of, *inter alia*, Trip.com's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Trip.com's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

23. Trip.com and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24. Headquartered in Singapore, Trip.com is a global travel agency that provides a one-stop online platform for booking flights, hotels, and other travel-related services and serves as the largest online travel platform in China. The Company generates most of its revenue from its accommodation reservations and transportation ticketing businesses. The accommodations business, which accounted for 42% of Trip.com's total revenue in 2025, generates revenue primarily from operations in China, where Trip.com charges a commission to hotel partners for reservations booked through the Company's platform.

25. Prior to the Class Period, China's primary antitrust enforcement regulator, the SAMR, significantly intensified antitrust enforcement against internet platform companies. For example, in 2021, the SAMR imposed a $2.8 billion fine on Alibaba Group Holding Ltd. for exclusionary agreements that barred merchants from using competing platforms.

26. Around the same time, Trip.com, among other internet companies, submitted a public commitment letter to the SAMR pledging to strengthen compliance systems and refrain from anticompetitive practices, such as forcing merchants to choose its platform over competitors, in order to comply with China's laws and regulations.

### Defendants' Materially False and Misleading Statements

27. The Class Period begins on April 30, 2024. On April 29, 2024, after markets closed, Trip.com filed with the SEC its annual report for the year ended December 31, 2023 (the "2023 Annual Report"), which was signed and certified by CEO Sun. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), CEO Sun and CFO Wang signed and filed certifications together with the 2023 Annual Report attesting to the accuracy of Trip.com's financial reporting, the disclosure of any material changes to Trip.com's internal controls, and the disclosure of all fraud.

28. The 2023 Annual Report contained the following risk disclosure pertaining to market competition:

> Item 3. Key Information
>
> * * * *
>
> D. Risk Factors
>
> * * * *
>
> Risks Relating to Our Business and Industry
>
> * * * *
>
> If we do not compete successfully against new and existing competitors, we may lose our market share, and our business may be materially and adversely affected.
>
> We compete primarily with other travel agencies, including domestic and foreign consolidators of hotel accommodation and airline tickets as well as traditional travel agencies. In the future, we may also face increasing competition from new domestic travel agencies or international players that seek to expand in China, hotels and airlines, as well as content platforms and social networks entering into the travel industry.
>
> We may face more competition from hotels and airlines as they enter the discount rate market directly or through alliances with other travel consolidators. In addition, international travelers have become an increasingly important user base for us. Competitors that have formed stronger strategic alliances with overseas travel consolidators may have more effective channels to address the needs of travelers in China to travel overseas. ***Furthermore, we do not have exclusive arrangements with our ecosystem partners. The combination of these factors means that potential entrants to our industry face relatively low entry barriers***. . . .

29. The 2023 Annual Report also included the following risk disclosure concerning the potential impact of developments in Chinese antitrust law on the Company's business and operations:

> D. Risk Factors

> * * * *
>
> Risks Relating to Doing Business in China
>
> * * * *
>
> We face uncertainties with respect to the interpretation and implementation of the Anti-Monopoly Guidelines for the Internet Platform Economy Sector and other anti-monopoly and competition laws and how it may impact our business operations.
>
> In February 2021, the Anti-Monopoly Guidelines for the Internet Platform Economy Sector were promulgated by the Anti-Monopoly Commission of the State Council. The guidelines are consistent with the PRC Anti-Monopoly Law and prohibit monopoly agreements, abuse of dominant position and concentration of undertakings that may have the effect of eliminating or restricting competitions in the field of platform economy. More specifically, the guidelines outline certain practices that may, if without justifiable reasons, constitute abuse of dominant position, including without limitation, tailored pricing using big data and algorithms, actions or arrangements seen as exclusivity arrangements, using technology means to exclude or restrict market competition, using bundled services to sell services or products, and compulsory collection of unnecessary user data. The guidelines also expressly state that concentration involving variable interest entities will also be subject to antitrust filing requirements.
>
> * * * *
>
> Since the regulatory and enforcement regime in relation to anti-monopoly and competition [are] relatively new and may change from time to time, uncertainties remain in relation to its interpretation and implementation. ***Although we do not believe we engage in any of the foregoing situations, we cannot assure you that our business operations will comply with such regulation in all respects, and any failure or perceived failure by us to comply with such regulation may result in governmental investigations, fines and/or other sanctions on us***.

30. On February 24, 2025, during an earnings call in connection with Trip.com's financial results for the fourth quarter of 2024, a Morgan Stanley analyst asked about the Company's "record high" operating margin in 2024 and whether the margin trend would continue in "2025 and beyond." CFO Wang responded by stating that Trip.com's margin was a "natural

outcome" of a "dynamic business mix" and "continuous improvement" in the Company's "operational efficiency across each business unit." In response to that same question, Wang further touted Trip.com's "transformative potential of [artificial intelligence ("AI")]-driven solutions, which will play a key role in enhancing our operational efficiency, streamlining our operations and mitigating cost pressures[,]" and that, "[i]n the longer-term period, we see no structural limitation to our profit margins."

31. On May 19, 2025, Trip.com held its earnings call for the first quarter of 2025, during which a Macquarie Research analyst asked about the state of the "domestic competitive landscape." In response, CEO Sun stated that "competition tends to be rationalized," while highlighting that Trip.com's loyalty program enabled "customers to get the best coverage with the most competitive pricing." Sun further added that the Company's partners were "able to differentiate different customers and offer customized service at different levels."

32. On August 27, 2025, during the Company's earnings call for the second quarter of 2025, CEO Sun stated that second quarter revenue "increased by 16% year-over-year," which purportedly reflected "healthy demand across our key markets and business segments." She further touted that Trip.com's inbound bookings in the China market "increased by over 100%" and emphasized that the Company was "well positioned" to satisfy growing travel demand in China due to its "scale, strong local partnerships, and extensive product coverage[.]"

33. On November 17, 2025, Trip.com held an earnings call to discuss its financial results for the third quarter of 2025. During the call, CEO Sun claimed that the Company's AI technology aided its partners to stay "competitive" in the travel industry market, stating:

> ***To further empower partners and elevate service standards across the industry, Trip.com Group is harnessing technology and AI to help the entire travel ecosystem move forward.*** Hotels can now overcome language barriers with our AI communication tools that

> respond to guest inquiries in real time. Our AI content generator and training tools also empower hoteliers to produce engaging content and sharpen their digital skills, helping them connect with international guests ***and with our updated hotel scoring and page ranking algorithms, we encourage hotels to focus on what truly matters, genuine service and lasting guest satisfaction instead of chasing ratings or ranking***.
>
> ***Together, these efforts help partners stay competitive in a fast-changing landscape and create richer, smoother and more seamless travel experiences for travelers around the world***. Travel is a fundamental part of the human experience, and we remain confident in the industry's long-term growth. We will continue to enhance our services and empower the broader ecosystem, driving sustainable growth across the travel industry and the wider economy.

34. During the same call, a China International Capital analyst asked about Trip.com's "margin . . . next year and in the longer term." In response, CFO Wang stated that Trip.com viewed its margin as a "natural result" of a "dynamic business mix" and "ongoing improvements" in efficiency "across each business segment," and that the Company did "not see any structural limitations to [its] profit margins."

35. The above statements identified in ¶¶ 27-34 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Trip.com required Chinese hotel operators to enter into anticompetitive exclusive arrangements that restricted their ability to work with competing online platforms; (2) the Company mandated that hotel operators offer their lowest available rates on Trip.com and employed both automated tools and manual interventions to lower prices that exceeded those offered on competing platforms; (3) the Company enforced these requirements through coercive measures, including traffic restrictions, delisting, and deductions from order reserve funds; (4) as a result, Trip.com derived significant but

unsustainable financial benefits from these anticompetitive practices; (5) once these practices were exposed and the Company could no longer maintain them, Trip.com's business and operations would suffer adverse impacts, including heightened regulatory scrutiny and substantial penalties; and (6) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

36. The truth about Trip.com's anticompetitive misconduct began to emerge before markets opened on January 14, 2026, when the SAMR announced that it had initiated an investigation into Trip.com for suspected anticompetitive misconduct violating the Anti-Monopoly Law of the People's Republic of China. That same day, Bloomberg published an article titled "China Starts Antitrust Probe of Trip.com Ahead of Travel Peak," highlighting that, in September 2025, a Chinese market regulator summoned Trip.com for violations of rules against setting "unfair restrictions" on merchant transactions and prices. The article further explained that "last month, the Yunnan Provincial Tourism Homestay Industry Association posted a statement on its official WeChat account, complaining that Ctrip abused its dominant market position."

37. On this news, the price of Trip.com's ADSs fell $12.90 per ADS, or approximately 17%, to close at a price of $62.78 per ADS on January 14, 2026.

38. Analysts immediately reacted. For example, UBS analysts issued a research report, explaining that the investigation is "likely to focus on some de facto exclusive partnerships," where Trip.com receives "preferential treatment in inventory and pricing," "and/or commission agreement" at a "gross level of 15-18% and can adjust dynamically for additional traffic support." Likewise, J.P. Morgan analysts stated that their assumption is that "scrutiny centers on Trip.com's

reported 'price adjustment tool'" containing certain repricing functions "that can reset certain hotel rates on Trip.com to the lowest price available online." The same analysts further described the SAMR's investigation as "complaint [and] evidence-driven" and "company-specific."

39. Then, on February 25, 2026, Trip.com continued to mislead investors about its anticompetitive conduct during its earnings call to discuss its financial results for the fourth quarter of 2025. On the call, a Citigroup analyst asked if the Company had "observed intensifying competition in domestic travel market." In response, CEO Sun stated that the Company's financial success was "anchored" not by anticompetitive practices, but by the "competitive edge" it supposedly maintained in its service capabilities and inventory coverage:

> ***Our competitive edge is anchored in a couple of fronts. First of all, we have always focused on high level of the services. We offer 24/7 excellent customer service.*** When you call our call center globally, we offer 24/7 service and any agent will be able to address any questions with you very effectively.
>
> Secondly, we offer very comprehensive products. So[,] when you travel with us, we offer flight, hotel, vacation package, rental car, anything that you need during your trip, which is also very convenient for our customers. In the unexpected events, such an earthquake or complex regional conflicts due to wars, we reach out to our customers within 2 minutes to make sure they are moved to the safe area. Our comprehensive product enable them to be rescued to their home country on a timely basis.
>
> ***The third one is our global coverage. Not only [do] we have a very good service and product domestically, we also developed a very strong service capability and inventory coverage globally***. So customers, when they travel with us, not only they can have peace in mind within the country, when they travel around the world, we are also behind them to support them. ***So all these strengths give us the competitive advantage, and we will continuously focus on our customers, making sure we offer the best product and best service to them.*** Thank you very much.

40. The above statements identified in ¶ 39 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects

to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Trip.com required Chinese hotel operators to enter into anticompetitive exclusive arrangements that restricted their ability to work with competing online platforms; (2) the Company mandated that hotel operators offer their lowest available rates on Trip.com and employed both automated tools and manual interventions to lower prices that exceeded those offered on competing platforms; (3) the Company enforced these requirements through coercive measures, including traffic restrictions, delisting, and deductions from order reserve funds; (4) as a result, Trip.com derived significant but unsustainable financial benefits from these anticompetitive practices; (5) once these practices were exposed and the Company could no longer maintain them, Trip.com's business and operations would suffer adverse impacts, including heightened regulatory scrutiny and substantial penalties; and (6) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

41. The truth fully emerged after markets closed on June 24, 2026, when Trip.com issued a press release announcing its financial results for the first quarter of 2026, reporting adjusted earnings per ADS of 5.73 yuan, which fell short of analysts' estimates of 6.09 yuan. In the same press release, Trip.com revealed that it "expects year-over-year total net revenue growth to decelerate to approximately 3%–8%, with a corresponding impact on margins and bottom-line results," for the second quarter of 2026. Trip.com attributed the expected deceleration to, among other things, "operational adjustments the Company implemented to align with evolving industry standards and compliance frameworks."

42. During the corresponding earnings call held later that day, a Jefferies analyst asked Trip.com to "characterize the recent competitive landscape in the China OTA market including the impact of regulatory developments." In response CEO Sun stated, in relevant part:

> [I]n China market, we are seeing evolving competitive landscape shaped by both compliance framework development and the emergence of AI native interfaces. So first, on the competition, the domestic OTA market remains structurally rational. Competition continues to center on quality of the service, supply coverage and user experience rather than aggressive price war. ***Second, on compliance enhancements, we see a clear and a consistent focus on platform, governance, transparent pricing and fair competition. We fully support this direction and have proactively strengthened our compliance and operational discipline. While this has caused some short-term pressure on our m[e]trics, we see this purely as an ordinary normalization in the long term***.

43. On this news, the price of Trip.com ADSs fell $5.81 per ADS, or more than 12%, to close at a price of $40.49 per ADS on June 25, 2026.

44. Analysts swiftly reacted to these revelations. Deutsche Bank issued a report titled "Macro and Operational Adjustments Impacting Near-term Outlook," noting that Trip.com's "2Q revenue guidance of +3% to +8% YoY significantly undershoots consensus (+14% YoY), suggesting a notable growth slowdown," which was "primarily attributed to" "operational adjustments to align with evolving industry standards and compliance frameworks." Additionally, Macquarie Equity Research analysts downgraded Trip.com ADSs, lowered their price target by 38%, and issued a report, which noted:

> TCOM reported 1Q26 revenue slightly above market expectations (by 2%) at up 17% YoY, though adjusted NP missed MQe by 7% and Visible Alpha consensus by 9% on a Rmb1.2bn below-the-line equity fair value loss. ***The company guided to softer 2Q26 revenue growth of 3-8% YoY, given*** 1) weaker long-haul travel demand from elevated air ticketing prices due to oil price increases; ***and 2) domestic hotel business adjustments and train ticketing VAS retractions from regulatory guidance***. Although we view TCOM's business as largely intact***, ongoing regulatory investigations (Fig 3), which remain subject to further uncertainty, could weigh on***

> ***monetisation upside and reduce short-to-medium-term earnings visibility***.

**Post-Class Period Developments**

45. Just one month after the Class Period, on July 25, 2026, the SAMR issued a press release announcing that it had "imposed administrative penalties" on the Company "for engaging in monopolistic conduct by abusing its dominant market position. The total amount of fines and confiscated illegal gains amounted to RMB 5.179 billion[,]"for abusing its dominant market position and engaging in monopolistic practices, with fines and confiscations totaling 5.179 billion yuan[,]" or approximately $765 million as of that date. As explained in the press release, the SAMR's comprehensive investigation established that Trip.com engaged in anticompetitive misconduct, as it a special task force conducted "on-site inspections of Trip.com and obtained a substantial volume of evidence, carried out extensive evidence-gathering investigations involving competing platforms and a large number of hotel operators on the platform," and, among other things, "comprehensively reviewed and analysed the evidence, including conducting in-depth big data analysis and algorithmic examinations."

45. [o]n-site investigations . . . carried out on Ctrip [Trip.com]" and obtained "a large amount of evidence[.]" The SAMR further explained that "[e]xtensive investigations and evidence collection were also conducted on other competitive platforms and a large number of hotel operators within the platform[,]" which was "comprehensively analyzed and sorted out, and in-depth big data analysis and algorithm analysis were carried out."

46. The SAMR's investigation "found that, ***since 2020***, Trip.com had abused its dominant position in China's domestic online hotel booking platform services market. With its traffic allocation mechanism at the core, Trip.com used platform rules and technological tools to

engage in two types of monopolistic conduct[.]" The SAMR's press release further detailed Trip.com's two monopolistic practices:

> First, ***Trip.com required hotel operators designated as "Special-Label" (特牌) hotels to enter into exclusive cooperation arrangements***. It incentivised hotels with preferential traffic allocation and support in platform benefits, encouraging hotels with high transaction volumes, good service quality and strong appeal to users to opt for "Special-Label" status, ***while requiring them not to cooperate with competing platforms***. Second, ***Trip.com compelled hotels designated as "Gold-Label" (金牌) or "Unlabelled" (无牌) hotels to offer the "lowest price across all platforms." It required hotel operators operating across multiple platforms to ensure that their prices on Trip.com were the lowest available across all platforms, while reserving the right to directly adjust their prices***. If a hotel's prices were found to be higher than those on competing platforms, Trip.com would lower them through technological tools and manual intervention, including tools known as the "Price Adjustment Assistant" (调价助手) and "Guapai Tong" (挂牌通). Meanwhile, ***Trip.com used technological means to monitor hotel operators' compliance with the exclusive cooperation and "lowest price across all platforms" requirements. It enforced these arrangements through punitive measures, including restricting traffic, removing hotels' designated status ("摘牌"), and deducting order reserve funds***.

47. The SAMR concluded that Trip.com's misconduct constituted an "abuse of a dominant market position through imposing restrictions on transactions without legitimate justification and attaching unreasonable trading conditions, as prohibited under Items 4 and 5 of Article 22(1) of the Anti-Monopoly Law."

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Trip.com ADSs between April 30, 2024 and June 24, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

49. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, Trip.com ADSs actively traded on the Nasdaq (an open and efficient market) under the symbol "TCOM." Millions of Trip.com ADSs were traded publicly during the Class Period on the Nasdaq. During the Class Period, as of June 2026, the Company had more than 600 million ADSs outstanding. Record owners and other members of the Class may be identified from records maintained by Trip.com or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

50. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class who were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

52. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Trip.com;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Trip.com;

e) whether the market price of Trip.com ADSs during the Class Period were artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

53. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

54. The market for Trip.com ADSs was an open, well-developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Trip.com's ADSs traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased Trip.com's ADSs

relying upon the integrity of the market price of the Company's ADSs and market information relating to Trip.com and have been damaged thereby.

55. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's ADSs, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Trip.com's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's ADSs to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's ADSs at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

56. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

57. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Trip.com, their control over, receipt, and/or

modification of Trip.com's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Trip.com, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

58. As a result of their purchases of Trip.com's ADSs during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

59. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Trip.com who knew that the statement was false when made.

## LOSS CAUSATION

60. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

61. As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Trip.com's ADSs and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Trip.com's ADSs fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

62. The market for Trip.com ADSs was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Trip.com ADSs traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's ADSs relying upon the integrity of the market price of Trip.com ADSs and market information relating to Trip.com and have been damaged thereby.

63. At all times relevant, the market for Trip.com ADSs was an efficient market for the following reasons, among others:

a) Trip.com was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b) As a regulated issuer, Trip.com filed periodic public reports with the SEC and/or the Nasdaq;

c) Trip.com regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d) Trip.com was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

64. As a result of the foregoing, the market for Trip.com ADSs promptly digested current information regarding Trip.com from all publicly available sources and reflected such

information in the Company's ADS price. Under these circumstances, all purchasers of Trip.com ADSs during the Class Period suffered similar injury through their purchase of ADSs at artificially inflated prices, and a presumption of reliance applies.

65. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

66. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Trip.com's ADSs; and (iii) cause Plaintiff and other members of the Class to purchase Trip.com

ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

68. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain artificially high market prices for Trip.com ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Trip.com's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Trip.com's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Trip.com and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

70. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

71. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Trip.com's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its ADSs. As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

72. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Trip.com ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the ADSs trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased Trip.com ADSs during the Class Period at artificially inflated prices and were damaged thereby.

73. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Trip.com was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Trip.com ADSs, or, if they had purchased such ADSs during the Class Period, they would not have done so at the artificially inflated prices that they paid.

74. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against All Individual Defendants**

76. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

77. The Individual Defendants acted as controlling persons of Trip.com within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

## PRAYER FOR RELIEF

80. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other and further relief as this Court deems appropriate.

**JURY DEMAND**

81. Plaintiff demands a trial by jury.

Dated: November 25, 2026

Respectfully submitted,

By: */s/ Marco A. Dueñas*

**SAXENA WHITE P.A.**
Marco A. Dueñas
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
mduenas@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (954) 916-1202
Fax: (954) 916-1232
msaxena@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Plaintiff Police & Fire Retirement System of the City of Detroit*

**CLARK HILL PLC**
Ronald A. King
215 South Washington Square

Suite 200
Lansing, MI 48933
Tel.: (517) 318-3015
Fax: (517) 318-3068
rking@clarkhill.com

*Additional Counsel for Plaintiff Police &
Fire Retirement System of the City of Detroit*